ROBERT SANDERS, Transferee, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Sanders v. Commissioner
Docket Nos. 2503-69, 2504-69, 2505-69, 2506-69, 2507-69, 2508-69, 6065-69, 6066-69, 6067-69, 6068-69, 6069-69.
United States Tax Court
T.C. Memo 1973-75; 1973 Tax Ct. Memo LEXIS 214; 32 T.C.M. (CCH) 332; T.C.M. (RIA) 73075; March 29, 1973, Filed *214 1. In December of each year Sons, Inc., accrued annual bonuses on its corporate books to Nathan Sanders and his three sons. In March of each year, the bonuses accrued from the prior year were paid out to the Sanders by check. The recipients endorsed the checks back to Sons, Inc., and the bonuses were then credited to officer 2 loan accounts by Sons, Inc. Held: The bonus accrual and payment procedure was a sham. The Sanders did not realize income therefrom, and Sons, Inc., is not entitled to a business expense deduction as a result of these transactions, Sanders and Sons, Inc., et al., T.C. Memo 1967-146. The Sanders realized nondeductible distributions from Sons, Inc., when they withdrew funds from the officer loan accounts. 2. In 1967 Nathan Sanders and his three sons closed out their officer loan accounts to Sons, Inc., which had been funded solely by the annually accrued bonuses, receiving cash in the amount of the balances therein or, in the case of Nathan, a credit against his liability to Sons, Inc. Held: Nathan Sanders and his three sons received nondeductible distributions from Sons, Inc., in amounts equal to their balances in the officer loan accounts. 3. In winding *215 up its business affairs in 1967, Sons, Inc., wrote loans to Eagle Properties and Crest Interiors off of its books when it received a $17,000 check from C & D as payment for some of Sons, Inc., inventory. Held: The transaction resulted in a nondeductible distribution from Sons, Inc., to Nathan Sanders in the amount of $17,000 in 1967. 4. In 1967 Sons, Inc., transferred substantially all of its assets to C & D. Thereafter, C & D assumed the business of Sons, Inc., using essentially the same location, employees, and suppliers. Held: C & D received inventory and goodwill from Sons, Inc., for less than full consideration. C & D's cost of goods sold for 1967 is reduced by the amount of Sons, Inc., inventory received for less than full consideration. 5. C & D, Nathan Sanders, and his three sons are liable as transferees for the unpaid tax deficiencies of Sons, Inc., for 1962 through 1965, plus interest, in the amounts determined herein or hereunder. Gene W. Reardon, for the petitioners. Marvin T. Scott, for the respondent. 3 DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies and adjustments in the Federal income taxes of petitioners *216 for the designated years in the following amounts: Docket No.
Petitioner
Year
Deficiency(Overassessment)
2508-69
Sanders and Sons, Inc.
1965
$13,837.13
6065-69
Sanders Carpets and Draperies, Inc.
1967
8,789.49
6066-69
Paul L. Sanders and Sharon A. Sanders
1966
(617.21)
1967
12,014.50
6067-69
Robert Sanders and Patricia Sanders
1966
(589.18)
1967
12,022.85
6068-69
Lawrence Sanders and Roberta P. Sanders
1966
(575.34)
1967
13,157.44
6069-69
Nathan M. Sanders and Irene Sanders
1966
2,435.42
1967
23,555.20 Additionally, respondent determined that petitioners, as actual or constructive transferees of assets of Sanders and Sons, Inc., are liable for the $70,690.28 unpaid tax deficiency of the transferor, Sanders and Sons, Inc., for the years 1962 through 1964, plus statutory interest thereon, determined in a prior decision of this Court in Sanders and Sons, Inc., et al., T.C. Memo 1967-146. Petitioners' liabilities as transferees were determined as follows: 4 Docket No.
Petitioner
Transferee Liability
2503-69
Robert Sanders
$60,347.64
2504-69
Paul L. Sanders
80,347.64
2505-69
Lawrence Sanders
60,359.22
2506-69
Nathan M. Sanders
84,527.41
2507-69
Sanders Carpets and Draperies, Inc.
70,690.28
In a subsequent notice of transferee liability *217 respondent determined that petitioners are also liable as transferees for any unpaid tax deficiency of Sons, Inc., for 1965. The cases were consolidated for trial. Sanders and Sons, Inc., will be referred to herein as Sons, Inc., and Sanders Carpets and Draperies will be referred to as C & D. The following questions are presented for our decision: 1. Whether Nathan and his three sons realized income from Sons, Inc., for bonuses accrued on the corporate books, or paid by Sons, Inc., to them during the years 1965 through 1967. 2. Whether Sons, Inc., is entitled to a business expense deduction for bonuses to Nathan and his three sons accrued on its corporate books or paid during 1965 through 1967. 3. Whether Nathan and his three sons realized income when Sons, Inc., closed out its officer loans payable accounts in 1967. 5 4. Whether Nathan realized income in the amount of $17,000 when Sons, Inc., closed out its loans receivable accounts from Eagle Properties and Crest Interiors in 1967. 5. Whether Nathan and his three sons constructively received goodwill and inventory from Sons, Inc., in 1967. 6. Whether C & D received goodwill and inventory from Sons, Inc., in 1967. 7. *218 Whether Nathan, his three sons, and C & D are liable as transferees for the income tax deficiencies assessed against Sons, Inc., for the years 1962 through 1965. In their petitions petitioners allege that assessment of liability against Nathan, his three sons, and C & D, as transferees of Sons, Inc., is barred by the statute of limitations. However, this issue was specifically abandoned by petitioners in their opening brief. FINDINGS OF FACT A few of the facts in this case have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. [2]
Sanders and Sons, Inc., was a Denver company incorporated in 1957 under the laws of Colorado. For 1965 and prior years Sons, Inc., reported income as a regular corporation, but for 6 the years 1966 and 1967, it was an electing small business corporation under Subchapter S of the Internal Revenue Code of 1954. During those 3 years Sons, Inc., accounted for income under the accrual method of accounting and filed its Federal corporate income tax returns on a *219 calendar-year basis with the district director of internal revenue at Denver, Colo. Sanders Carpets and Draperies, Inc., is a Denver company incorporated on August 31, 1967, under the laws of Colorado. C & D, Inc., filed its Federal corporate income tax return for the calendar year 1967 with the district director of internal revenue at Denver, Colo. , reporting its income under the accrual method of accounting. Its principal place of business was Denver, Colo., at the time it filed its petition herein. All of the individual petitioners herein, Paul L. Sanders, Robert Sanders, Lawrence Sanders, and Nathan M. Sanders and their respective wives, Sharon A. Sanders, Patricia Sanders, Roberta P. Sanders, and Irene Sanders, were residents of Denver, Colo., at the time their petitions herein were filed. Each petitioner filed his return on a calendar-year basis with the district director of internal revenue, Denver, Colo., reporting income under the cash method of accounting. Petitioners' wives are included solely because they filed joint returns with their husbands and will not be mentioned, except where necessary, in the remaining findings of fact. 7 Until Stptember 1967 Sons, Inc., *220 was an active company in Denver, Colo., engaged in the business of selling retail and commercial carpets and draperies. The business enjoyed a favorable reputation throughout the Rocky mountain States as being one of the best in commercial carpet sales. It did an extensive amount of advertising in newspapers and television, and also gained business through referrals. The reputation established for Sons, Inc., as a result of its excellent service, generated some repeat business. The business began as a sole proprietorship under the guidance and ownership of Nathan M. Sanders in the early 1950's and grew until it was incorporated in 1957. Upon incorporation, Nathan gradually took his three sons, Robert, Lawrence, and Paul, into the business as officers and shareholders. Nathan's wife, Irene, also became a shareholder, and the 10,000 shares of outstanding stock in Sons, Inc., were distributed among the family as follows: Years
Nathan
Irene
Lawrence
Robert
Paul
1957 thru 1960
5,000
4,991
1
1961
5,000
3,199
601
600
600
1962
4,100
2,999
1,201
1,200
1,200
1963
3,650
1,849
1,501
1,500
1,500
1964 thru 1967
3,650
949
1,801
1,800
1,800
During the period 1962 through 1967 the Sanders family shareholders held top positions *221 as officers in Sons, Inc., with Nathan serving as president, Robert, as vice president, Lawrence, as secretary-treasurer, and Paul, as assistant secretary treasurer. 8 From its incorporation in 1957 through 1966, Sons, Inc., operated as a successful and profitable enterprise. The earnings of the corporation during those years were reported as follows: Year
Gross Income
Net Income
1957
$ 56,782.26
$ 18,341.56
1958
68,809.23
17,580.49
1959
86,171.36
27,209.70
1960
104,694.2 9
27,372.66
1961
151,950.90
17,465.32
1962
197,136.00
24,629.00
1963
190 ,365.67
17,650.68
1964
190,397.21
22,787.83
1965
204,011.01
18,924.44
1966
234,314.69
24,654.30
1967
56,271.68
(131,315.14)
In spite of Sons, Inc.'s, continued growth and prosperity, it never declared a dividend to its shareholders during its entire history. Beginning with the year 1959, Sons, Inc., accrued bonuses on its books to Nathan, Robert, Lawrence, and Paul on December 31 of each of its operating years. The amounts of the accrued bonuses were as follows: Year
Nathan
Robert
Lawrence
Paul
1959
$ --
$ 3,000
$ 3,000
$ 1,500
1960
--
5,000
5,000
5,000
1961
10,000
10,000
10,000
5,000
1962
15,000
15,000
15,000
--
1963
5,000
5,000
5,000
5,000
15,000 [3] *222 1964
7,500
7,500
7,500
7,500
1965
7,500
7,500
7,500
7,500
1966
7,500
7,500
7,500
7,500 9 The bonus accruals were deducted on the corporation's income tax return in the year of accrual.
During March of the year following the entry of each accrual on the books of Sons, Inc., checks were issued to the officers for the amounts of the bonuses, less withheld income taxes. Upon receiving their bonus checks, Nathan, Robert, Lawrence, and Paul would each endorse his respective check for deposit in the bank account of Sons, Inc., and said amounts would be credited by the corporation to loans payable accounts in the name of each respective individual. The individual officers included the gross amounts of these bonuses in their taxable income in each of the years that the checks were issued. These bonus transactions were handled in the same manner throughout the period of the corporation's existence, 1959 through 1967. The loans payable accounts to each of the individual petitioners were subject to withdrawals by them and, in fact, were periodically used to supplement their individual cash positions. During the years 1965 through 1967, Nathan, Robert, Lawrence, and Paul each received a weekly salary from Sons, Inc., *223 as follows: Weekly Salaries
1965
1966
1967
Nathan
$200
$200
$300
Lawrence
200
200
300
Robert
200
200
300
Paul
150-175
175
300 10 All four of the Sanders family officers were full-time employees of the corporation, but Nathan, as president, had continuously diminishing responsibilities due to his advanced years. As a result, he began spending less time at the company store, enjoying more time for recreation and other pursuits, without the forfeiture of any salary. Nathan's three sons, however, worked regular hours for the business with Lawrence serving as officer manager, Robert, as a commercial carpet salesman, and Paul, as a retail drapery and carpet salesman. On July 7, 1967, an opinion of this Court in Sanders and Sons, Inc., et al., supra was filed, which resulted in a large deficiency in taxes owed by Sons, Inc., for the years 1962 through 1964. More details concerning the entry of decision in this case and efforts to collect the deficiencies are related hereinafter. C & D was incorporated on August 31, 1967, with Nathan, Lawrence, Robert, and Paul each purchasing 10,000 of the 40,000 outstanding shares of stock at $1 per share. It was formed to take over the business of Sons, Inc. Shortly *224 thereafter, C & D began its operations in the same store formerly used by Sons, Inc. , with business operations substantially the same. There was no immediate change in the business as conducted by C & D, and it had essentially the same employees, suppliers, officer personnel, 11 and stockholders as Sons, Inc. [4] Additionally, C & D benefited from the good reputation of Sons, Inc., as a well established business in commercial and retail carpet and draperies sales. On July 31, 1967, Sons, Inc., had an earned surplus of $147,068.05 and paid-in capital in the amount of $10,000; by August 31, 1967, its earned surplus had increased to $159,719.16. The company was actively engaged in business and solvent, and its asset position was secure enough that there were no restrictions on its credit from suppliers. For reasons herein noted, sometime during September or October 1967, Sons, Inc., ceased to be actively engaged in business. By October 31, 1967, the corporation's earned surplus *225 had diminished to $4,144.85, but its paid-in capital had not changed. The assets remaining in the company had a book value of $30,810.26, consisting of more than 1-year-old uncollected accounts receivable and some odds and ends of carpet inventory which was stored in a warehouse and later sold at public auction. Sons, Inc., was never formally dissolved or liquidated, and its charter was never officially cancelled. However, the corporation has not filed an annual report with the Colorado secretary of state since 1967, as required by State law, [5] 12 and it also has not filed a Federal corporate income tax return since 1967. Sons, Inc., liquidated all of its trade and business debts before it discontinued its operations, but it had insufficient assets to pay its tax liabilities. At no time during its existence did Sons, Inc., ever maintain an account for goodwill on its books. In winding up its affairs, Sons, Inc., transferred most of its tangible assets to C & D for cash.Included were all of its office equipment and fixtures; the majority of its collectible accounts receivable; [6] and a substantial portion of its inventory. *226 [7] The loans payable accounts to the individual petitioners were closed out in September 1967, and checks were issued to the three sons for the balance of their accounts as shown on the company books: Robert received $15,013.94; Lawrence, $10,972.93; and Paul, $20,254.38. [8] On the other hand, Nathan, who was indebted to Sons, Inc., for $26,076.28, but also had a $17,803.27 positive balance on the company's loans payable account to him, settled a major part of the difference with a cash payment to the business of $10,173.01. After several additional entries to his loan account from the company his debt was reduced to $600 and then completely liquidated with a final credit in that amount attributed to "officer salary." On September 6, 1967, Sons, Inc., entered bonuses in the amount of $12,000 for each of the Sanders officers on the company books. [9] After certain withholdings, *227 a check in the amount of $10,000 was issued to each of them on the same date. [10] Unlike the bonus accruals of prior years, these bonus checks were not endorsed back to Sons, Inc., and no amounts with respect thereto were entered on the corporation's loans payable accounts to the four officers. 14 During the month of October 1967, Sons, Inc., sold inventory to C & D at cost of $66,950.68. [11] On or about September 30, 1967, a physical inventory of the merchandise of Sons, Inc., was taken which reflected that the company had inventory on hand with an aggregate cost of $112,461.67. However, items with a cost totalling approximately $15,000 were lined out on the inventory statement. The sales journal of Sons, Inc., indicates that after September 12, 1967, only one sale was transacted for the remainder of *228 the month, which amounted to $45 and was recorded on September 26, 1967. There were no further sales recorded on the books of Sons, Inc., for the rest of its business life. Both C & D and Sons, Inc., used perpetual inventory methods to ascertain their inventory positions. Additionally, Sons, Inc., did not enter sales in its sales journal until after the merchandise had been installed or delivered and the invoice mailed to the purchaser. On October 31, 1967, the accounts payable of Sons, Inc., reflected a debit balance in the amount of $45,016.28. The general ledger of Sons, Inc., reflected "October purchases" 15 $45,016.28. The general ledger entry was made by the company's accountant to balance out the debit in the accounts payable, and thus equalize purchases and payments for the period. There were no similar adjusting entries *229 of this magnitude made to purchases reflected on the books of Sons, Inc., for prior years. Instead, entries were normally made in the purchase register of Sons, Inc., when the invoice and the merchandise were both received. Concurrently, C & D made a large adjusting entry in its books for the year ended 1967. C & D's accountant, who also prepared the books of Sons, Inc., made a year-end adjusting entry increasing its purchases by the amount of $34,173.59. In attempting to verify the extraordinary year-end entry, a revenue agent requested detailed support of the entry figure but was informed by the accountant and Lawrence Sanders that the inventory sheets for December 1967 had been lost. Nathan Sanders was a partner in two development enterprises, Crest Interiors and Eagle Properties. On August 31, 1967, the books of Sons, Inc., reflected loans receivable from Crest Interiors and Eagle Properties in the respective amounts of $10,000 and $7,000. These loans had previously been made to the two companies at Nathan's behest. The $17,000 check dated October 31, 1967, given to Sons, Inc., by C & D in partial payment for inventory transferred from Sons, Inc., to C & D 16 was credited *230 to these two loans receivable accounts on the books of Sons, Inc., rather than being credited to sales, thus reducing the balances in the two accounts to zero. As previously mentioned, an opinion of this Court in Sanders and Sons, Inc., et al., supra, was filed on July 7, 1967. The petitioners in those consolidated cases were Sanders and Sons, Inc., Nathan M. Sanders and Irene Sanders, Robert Sanders and Patricia Sanders, Lawrence Sanders and Roberta P. Sanders, and Paul L. Sanders. One of the several issues decided by the case was whether respondent erred in disallowing deductions for "bonuses" allegedly paid to company officers during the years 1962, 1963, and 1964.[12] In deciding the issue against petitioners, this Court, with Judge Murdock presiding, stated: The record does not show that the amounts thus accrued and deducted by the corporation were ordinary and necessary expenses of the corporation or that they were reasonable allowances for salaries or other compensation for personal services actually rendered by the payees. So far as the record shows the whole procedure in each year was a prearranged farce under which no funds of the corporation actually left the corporation *231 or were intended to leave it. In addition the record fails to show that the amounts involved would have been reasonable compensation for services actually rendered if each employee had kept the amount of each check which he received instead of returning each check to the corporation. 17 The opinion of the Court provided that the decisions in the consolidated cases be entered under Rule 50 of the Tax Court Rules of Practice and Procedure. The decisions were entered on October 11, 1967, and became final on January 9, 1968, upon the expiration of the 90-day appeal period. There was no disagreement concerning the computation of the tax deficiency of Sanders and Sons, Inc., which was determined to be $70,690.28, plus statutory interest thereon. There was, however, disagreement on the part of petitioners Nathan M. Sanders, Robert Sanders, Lawrence Sanders, and Paul Sanders with respect to respondent's inclusion of the alleged bonus payments for the years 1962, 1963, and 1964 in their taxable incomes to determine their individual deficiencies *232 for those years. At a hearing on the Rule 50 computation on September 27, 1967, petitioners argued that because each individual was on a cash method of income reporting, there should be no recognition of income on their part until they actually received money from the corporation. At the hearing this Court adopted petitioners' computation, and they were allowed to exclude the amounts of the bonuses from their individual incomes. Accordingly, each petitioner has filed for a refund to recover taxes paid on amounts accrued and handled in a like manner during 1965 through 1967. 18 The amounts credited to the officers' loans payable accounts on the books of Sons, Inc., when the bonus checks were returned to Sons, Inc., were not removed from those accounts by reversing entries. The officers from time to time drew funds from these accounts for personal living expenses, etc., and a running balance appeared in the accounts up until the time they were closed out in September 1967 by payments to the officers. The deficiencies set forth in the Sanders and Sons, Inc., et al., Memorandum decision entered on October 11, 1967, were duly assessed by respondent on February 23, 1968. The delinquent *233 account was assigned to a revenue agent for collection on April 15, 1968. On May 29, 1968, a revenue agent met with Lawrence Sanders and the attorney for Sanders and Sons, Inc.As a result of that meeting, the revenue agent discovered in a statement of financial condition that the company had total assets of $33,096.30, [13] and liabilities totaling $95,049.97. [14] The statement further disclosed that the company had disposed of some of its assets or property since the date the tax deficiency was determined for less than full value. Furthermore, 19 the agent learned for the first time that Sons, Inc., had ceased doing business. Subsequently, upon filing a lien on the remaining assets of Sons, Inc., the agent learned that there was an Arapahoe County property tax lien senior to that of the Internal Revenue Service.After an unsuccessful attempt *234 to sell the inventory by all of the parties involved, it was determined that the Arapahoe County treasurer's office would seize the remaining merchandise inventory of Sons, Inc., and sell it at public auction. Again, all of the parties attempted to generate interest in the auction among potential buyers. At the auction, the inventory was offered for a minimum bid set at $5,000 and purchased for that amount on one uncontested bid. Upon settlement of the Arapahoe County lien, plus interest thereon, and costs of the sale, the net amount remaining from the distraint sale was $1,993.49, which the internal revenue service received on September 5, 1968, and applied to the assessed income tax deficiency of Sons, Inc., for its taxable year 1964. This left an unpaid balance due on the deficiencies assessed against Sons, Inc., of $68,696.79, plus interest. It was about this time that the agent became aware of the existence of C & D as the successor to the business interests of Sons, Inc. 20 In determining deficiencies for the years 1965 through 1967 involved in these cases, respondent, relying on the findings of T.C. Memo 1967-146 with regard to the salary bonuses that Sons, Inc., allegedly *235 paid to petitioners Nathan, Robert, Lawrence, and Paul, disallowed the deductions taken by the corporation for the $30,000 of bonuses accrued on its books as of December 31, 1965, and determined a deficiency for the year 1965 against the corporation in the amount of $13,837.13. Likewise, for 1966 respondent determined that Sons, Inc., was not entitled to a deduction for the $30,000 of bonuses on its books as of December 31. Respondent further determined that since Sons, Inc., was an electing small business corporation during 1966, the disallowed bonuses increased the individual petitioner's distributable income from Sons, Inc., for that year. [15] *236 However, since Irene and Nathan owned more stock in Sons, Inc., than their sons, respondent determined that there were three overassessments: Paul, for $617.21; Lawrence, for $575.34; and Robert, for $589.18, due to the fact that each had paid income tax on his purported $7,500 bonus distribution. Nathan and Irene, on the other hand, were determined to be deficient in their 1966 income taxes by an amount of $2,435.42. 21 For the calendar year 1967 respondent disallowed a deduction of $34,173.59 of Sanders Carpets & Draperies, Inc., for cost of goods sold, and also determined that the corporation's purchases should be increased by the amount of $15,862.16 for inventory contributed by stockholders. Upon these adjustments respondent determined a deficiency for the corporation of $8,789.49. Because of the disallowance of the deductions claimed by Sons, Inc., for bonuses to the officers in 1967, respondent determined adjustments in the taxable incomes of the individuals, for 1967, as stockholders of Sons, Inc., a Subchapter S corporation, as follows: Paul L. Sanders and Sharon Sanders received taxable dividends in the amount of $30,519.15, realized a long-term capital gain of $14,704.69, and were denied a $14,282.55 operating loss; Robert Sanders and Patricia Sanders received taxable dividends in the amount of $30,519.15, realized a long-term capital gain of $19,274.84, and were denied a $14,282.55 operating loss; Lawrence Sanders and Roberta P. Sanders received taxable dividends in the amount of $30,536.11, realized a long-term capital gain of $19,234.51, and were denied *237 a $14,290.48 operating loss; Nathan M. Sanders and Irene Sanders received taxable dividends in the amount of $61,886.10 and were denied a capital loss of $36,491.93. [16] 22 In his notices of liability dated March 7, 1969, respondent determined that petitioners, as actual or constructive transferees, were liable for the assessed but uncollected deficiencies of Sanders and Sons, Inc., determined pursuant to T.C. Memo 1967-146: Sanders Carpets & Draperies, Inc., was liable for an amount not exceeding $65,794.84; Nathan M. Sanders, Robert Sanders, Lawrence Sanders, and Paul L. Sanders were liable for the aggregate of the unsettled deficiencies, plus interest thereon. Subsequently, in his notices of liability dated April 29, 1969, respondent determined that the individual petitioners were liable for the 1965 deficiency determined against Sanders and Sons, Inc., in the amount of $13,837.13. Nathan, Robert, Lawrence, and Paul were each determined to be liable, as actual or constructive transferees, for the entire amount of the 1965 deficiency *238 of Sanders and Sons, Inc., plus interest thereon. By amended answers filed at trial on October 4, 1971, respondent, through various adjustments to his previous computations in the notices of liability and answers, redetermined the transferee liability of petitioners: Sanders Carpets and Draperies, Inc., was liable for the entire $70,690.28 unpaid deficiency, plus statutory interest thereon, assessed against Sanders and Sons, Inc., pursuant to T.C. Memo 1967-146; Nathan M. Sanders was liable for the amount of $84,527.41, plus 23 statutory interest thereon; Robert Sanders was liable for the amount of $60,347.64, plus statutory interest thereon; Lawrence Sanders was liable for the amount of $60,359.22, plus statutory interest thereon; Paul L. Sanders was liable for the amount of $80,347.64, plus statutory interest thereon. [17] On the same date, respondent filed additional amended answers in which he redetermined the individual petitioners' 1967 income tax deficiencies: Nathan M. Sanders and Irene Sanders received additional taxable income in the amount of $15,250.83 which increased their 1967 deficiency $7,943.04 to $31,498.24; Paul L. Sanders and Sharon A. Sanders received additional *239 taxable income in the amount of $5,722.11 which increased their 1967 deficiency $2,859.84 to $14,874.34; Robert Sanders and Patricia Sanders, and Lawrence Sanders and Roberta P. Sanders received no additional taxable income over that determined in their notices of deficiency. Conjointly, in the amended answers respondent raised the argument that under the doctrines of estoppel and duty of consistency, petitioners are estopped to deny that they received income in 1967 in the total amounts of the bonuses credited to their loans payable accounts in the years 1962 through 1967, in the following amounts: Nathan, for $52,500; Robert, for $27,500; Lawrence, for $27,500; and Paul, for $47,500. 24 OPINION [18] *240 Bonuses - Officer Loan Accounts Respondent's position with regard to these issues is that the bonuses entered on the books of Sons, Inc., from 1965 through 1967, and the checks issued commensurate thereto did not give rise to ordinary and necessary business expenses deductible by the corporation. He argues the purported bonuses constituted excessive compensation, and the aggregate amounts accrued to the Sanders over the period in issue were actually or constructively received by each when the spurious officer loan accounts were closed out in September 1967. Respondent argues further that under the doctrines of collateral estoppel, quasi-estoppel, and duty of consistency, petitioners are prohibited from denying the "bonus" amounts excluded from their incomes in 1962, 1963, and 1964, *241 under T.C. Memo 1967-146, were received by them in 1967 when 25 the officer loan accounts were closed on the books of Sons, Inc. Finally, respondent contends Nathan Sanders received additional excessive compensation in the amount of $600 on October 31, 1967, when his loan account from Sons, Inc., which reflected a $600 debit, was closed out with a $600 credit attributed to "officer salary." Contrarily, petitioners take the position that they have consistently treated the purported bonuses as wages and said payments were not unreasonable or excessive compensation. They further contend, except for the $12,000 bonuses paid in September 1967, all of the bonuses were returned to Sons, Inc., in the form of loans from the officers to the corporation. Evidently, they would have us believe the checks issued in liquidation of the officers' accounts were to repay the outstanding loans, and thus, were a nontaxable event. In support of this last contention petitioners urge that this Court's ruling with regard to the Rule 50 computation, made pursuant to the decision in T.C. Memo 1967-146, clearly indicates the purported bonuses are not to be treated as dividends. There is no fixed rule by which *242 a reasonable salary can be determined, for the question is purely one of fact to be determined under the circumstances present in each particular situation. Perlmutter v. Commissioner, 373 F. 2d 45 (C.A. 10, 1967), affirming 44 T.C. 383 (1965); Huckins Tool and Die, Inc. v. Commissioner, 289 F. 2d 637 (C.A. 10, 1965). The burden was on petitioners to prove that respondent's determinations that the bonuses were in excess of reasonable compensation were erroneous. This they failed to do. The record is devoid of comparative evidence with respect to normal salaries in the commercial and retail carpet business, and of any other evidence to indicate that the bonuses plus the salaries paid the officers were not in excess of reasonable compensation for the services they rendered. There is no evidence to indicate that the weekly salaries paid to the officer-stockholders were not adequate compensation for the services rendered. This is particularly true with regard to Nathan, who testified, in effect, that he spent more time on the golf course than he did in the business during the years here involved. Moreover, other persuasive factors lead us to believe that the bonuses were not really *243 intended as compensation for services rendered. Despite the corporation's remarkable growth and profitability, Sons, Inc., never paid a dividend as such; at least some of the bonuses were not authorized by the board of directors; the bonuses to the Sanders were almost always equal even though it is doubtful that the value of their services was equal; and the Sanders' dual role as owner-employees diminished the chance of complete arm's-length bargaining for the bonuses. 27 In addition, in light of the fact that the Sanders always endorsed the bonus checks, except the bonuses paid in September of 1967, and returned them to the corporation, it appears the Sanders were not actually receiving any immediate economic benefit from the bonuses. We concluded in Sanders and Sons, Inc., et al., supra, that the bonus procedures utilized in the years 1962 through 1964 were a farce and that the purported bonuses accrued on the corporate books in those years were not in fact paid. The bonus procedures used in the years 1965 through 1967 were the same as those employed in the years 1962 through 1964, and we conclude that, except for the bonuses paid in September of 1967, the bonuses paid in 1965 *244 through 1967 were not in fact paid. Respondent argues that under the doctrines of collateral estoppel, quasi-estoppel, and duty of consistency, the Sanders are prohibited from denying that the entire amounts of the bonuses which were accrued by the corporation and credited to their loans payable accounts, but excluded from their taxable income for the years 1962 through 1964 under the ruling of this Court in the earlier case, must be taken into income by them when the officers' loan accounts were closed out in September of 1967. We cannot agree. All that the Sanders argued in the Rule 50 computation 28 of the decisions in the 1962 through 1964 case was that if the bonuses were not in fact paid they should not be included in their taxable income because they were all cash-basis taxpayers. It is not inconsistent for them to now argue that the entire amounts credited to their loan accounts should not be taken into their income in a lump sum in 1967. The way we see it, nothing should have been credited to their loans payable accounts as a result of the return of the "bonus" checks; thus, as the Sanders from time to time drew funds from the corporation against the loans payable accounts, *245 these amounts were includable in their taxable incomes as distributions from the corporation when the funds were drawn or charged against the accounts. This means that the balances in the loans payable accounts of each of the Sanders as of the date those accounts were closed out will be treated as distributions to them from Sons, Inc., in 1967. This applies to Nathan as well as the sons, because while Nathan did not actually receive a check for the balance reflected in his loans payable account, he did receive a credit in that amount against his loans receivable account, thus extinguishing a part of his liability. The $600 balancing figure is also taxable to Nathan as a distribution. 29 It can be argued that the Sanders should be estopped from denying, or under a duty of consistency should not deny, that the amounts drawn by them against the loans payable accounts during 1962 through 1964 should not be taxed to them in the years here involved, because in the Rule 50 computation in the 1962 through 1964 case they took the position that none of the bonus payments were includable in their taxable incomes for those years. However, a review of the transcript of the hearing under Rule 50 *246 in the above case reveals that their position was simply that the bonuses should not be included in their incomes as salary or compensation. Judge Murdock indicated at the hearing that amounts drawn against the loan accounts in the years 1962 through 1964 might be taxable to them as dividends in those years, but respondent made no effort to pursue that suggestion. So we cannot agree with respondent that petitioners are now estopped to deny that the amounts charged to the loan accounts in 1962 through 1964, or the amounts withdrawn against those accounts in those years, should be taxed in a lump sum to these cash-basis taxpayers in 1967 when the loans payable accounts were closed out. Only the balances in those accounts which were actually paid to them or credited to their liabilities as a result of closing out the loans payable accounts are to be treated as distributions to them by the corporation. 30 The gross amount of the bonuses paid to the Sanders in September of 1967, to the extent they received benefits therefrom in the form of cash which was not returned to the corporation, or in the form of taxes or other charges paid for their accounts, are also to be treated as distributions *247 to them from Sons, Inc., in 1967. It follows from our above conclusions that Sons, Inc., is not entitled to deductions for the purported bonuses declared or paid during the years 1965 through 1967. Even if paid, they were not ordinary and necessary business expenses of the corporation. With regard to the effect on transferee liability of the Sanders as a result of our conclusions above, we hold that the Sanders are liable as transferees of Sons, Inc., to the extent of the amounts paid to them as bonuses in September of 1967 and the amounts paid to them or credited to them in closing out the officers' loans payable accounts in September. There is no evidence that any amounts withdrawn by them before Sons, Inc., went out of business would have caused Sons, Inc., to become insolvent, or that Sons, Inc., was insolvent prior to the transactions that took place in September of 1967; but it is clear that the payments made to the Sanders in September of 1967 in the form of bonuses and payments closing out their purported loans payable accounts did cause Sons, Inc., to become insolvent. 31 Eagle Properties and Crest Interiors Accounts Nathan Sanders was a partner in both Eagle Properties *248 and Crest Interiors. On August 31, 1967, the books of Sons, Inc., reflected loans receivable from Crest Interiors and Eagle Properties in the amounts of $10,000 and $7,000, respectively. These loans were made at the behest of Nathan and should have been charged to his personal loan account. As a part of its final operations in October 1967, Sons, Inc., transferred inventory worth $66,950.68 to C & D for which it received four checks totaling that amount in return. Of the four checks, one written on October 31, 1967, was for $17,000. During approximately the same period, the two loans receivable from Crest Interiors and Eagle Properties were written off the books of Sons, Inc. The only evidence offered to explain how this happened was the testimony of respondent's examining revenue agent who testified that the check was entered in the cash receipts journal of Sons, Inc., but was not entered in the sales journal; instead, it was removed from cash and credited to the loans receivable accounts of Crest and Eagle, thus closing them out.
Nathan testified that the loans to Crest and Eagle were his personal loans and should have been charged to his account. 32 Respondent determined these *249 two receivables were written off the corporation books without actual repayment; the C & D payment procedure employeed in the $66,950.68 inventory purchase from Sons, Inc., was designed to help cover the two disappearing loans; and, in fact, the loans were forgiven, which resulted in additional income to Nathan in the amount of $17,000 due to his personal obligation on the debts. Petitioners' sole defense is respondent's lack of proof. Petitioners have the burden of proving error in respondent's determination on this issue. Rule 32, United States Tax Court Rules of Practice. In this particular instance, we find that petitioners have failed to produce any evidence to refute the determination while respondent has enhanced his position with convincing circumstantial evidence. Accordingly, the elision of two loans from the corporation's books, the unexplained failure to record the $17,000 check from C & D as a sale, and the absence of any other cash receipt in that amount during winding-up operations of Sons, Inc., convinces us respondent's contention is correct. On the evidence presented by respondent, we find that Nathan realized $17,000 in income when Sons, Inc., closed out its *250 loan accounts to Crest Interiors and Eagle Properties. 33 Inventory Respondent determined that $60,878.44 of inventory was transferred by Sons, Inc., to C & D in September/October of 1967 without consideration; or, in the alternative, was transferred by Sons, Inc., to its stockholders without consideration, and then transferred by them to C & D. This amount is the total of $15,862.16 which respondent claims disappeared from the closing physical inventory of Sons, Inc., and $45,016.28 which was an unexplained adjusting entry made in Sons, Inc.'s, purchases account when it ceased doing business. So far as we can determine from the record respondent's determination is based on the following reasoning. Sons, Inc., took a physical inventory of its merchandise during the latter part of September 1967 which reflected inventory of carpet and drapes with an aggregate cost of $112,461.67.Of this inventory, $66,950.68 was transferred to C & D at cost and $29,648.83 was left in Sons, Inc., and was later sold at a tax sale. There was also some amount of merchandise lined off of the final inventory sheets, which respondent dtermined had an aggregate cost 34 of $15,862.16. [19] Respondent takes *251 the position that this $15,862.16 of inventory was somehow transferred to C & D without consideration. Petitioners argue that the inventory items in question were lined off on the inventory sheets because it was discovered that they had either been sold by Sons, Inc., previously but had not been delivered or were sold during the course of taking the physical inventory. During the month of October 1967, the books of Sons, Inc., reflect payments made to carpet suppliers in excess of purchases, resulting in a debit balance in the accounts payable of Sons, Inc., as of October 31, 1967, in the amount of $45,016.28. The accountant for Sons, Inc., made an adjusting entry in Son's Inc.'s, purchases account in that amount to avoid the appearance that Sons, Inc., had overpaid their liabilities by that amount. Similarly, *252 the accountant testified that in closing out the books of C & D for 1967 he discovered that the accounts payable figure on the books of C & D was $34,173.59 in excess of the year-end figure in the purchases register, so he made an adjusting entry of that amount in the purchases 35 register of C & D to balance purchases with accounts payable. It is respondent's contention that Sons, Inc., paid for $45,016.28 of inventory in October of 1967 that wound up in the hands of C & D without consideration, and that C & D sold this merchandise on its own account; and that the variances in the accounts payable and purchases accounts of the two companies which required adjusting entries to bring them into balance supports this contention. Petitioners had little to say about the $45,016.28 adjustment in their brief, and we are not certain what their explanation of this issue is. It has become quite apparent from reviewing the record in this case, however, that soon after the opinion of this Court was released in the prior case the petitioners became very much concerned with denuding Sons, Inc., of all its assets that might be used to pay the tax liabilities of Sons, Inc., resulting from that *253 opinion and that its bookkeeping suffered considerably in the crunch, whether by carelessness or deliberation we are not called upon to decide. With respect to the $15,862.16 of inventory lined off of the physical inventory sheets, we think petitioners must prevail. Lawrence Sanders, who participated in taking the physical inventory and making up the inventory sheets, testified that while he did not remember exactly why the 36 various items were lined out on the inventory sheets, he did recall that during the taking of the inventory or soon thereafter it was discovered that certain items that were physically present in the inventory were sold by Sons, Inc., in the process of winding up its business. It would appear that any such sales were not recorded on the books of Sons, Inc., in October, which is the foundation for respondent's argument, but that is not the question we have here. It is not reasonable to assume that when Sons, Inc., had a physical inventory taken to determine what inventory it would sell to C & D for cash, it would delete certain items that were itemized on the inventory sheets and transfer those specific items to C & D without consideration. On the other hand, *254 we think the preponderance of the evidence supports respondent's position with respect to the $45,016.28 of inventory determined by respondent to have been transferred to C & D without consideration. It appears from the entries on Sons, Inc.'s, books that it overpaid its suppliers by that amount for inventory which was not entered in its purchases register and, so far as we can determine from the record, did not show up in its physical inventory. The most logical explanation is that this inventory, apparently paid for by Sons, Inc., in October of 1967 as it was going out of business was delivered to C & D and sold by it in the regular course of 37 its business. While the adjusting entry in the amount of $34,173.59 found to be necessary in the books of C & D to bring its accounts into balance does not jibe with the entry made in the books of Sons, Inc., it does tend to support respondent's determination. Support for the argument that Sons, Inc., paid for merchandise in September and October of 1967 which it did not include in reported sales is also found in the fact that Sons, Inc., which had conducted a profitable business for many years, reflected an operating loss of about $133,000 *255 for the months of September and October on its books. We find for respondent with regard to this item. In the notice of deficiency issued to C & D for its taxable year 1967 respondent determined that C & D had failed to establish that it was entitled to a deduction in the amount of $34,173.59 brought about by the adjusting entry to purchases mentioned above; accordingly, respondent increased C & D's taxable income by that amount. The only evidence presented on this issue was the testimony of C & D's accountant that he made the adjusting entry to in some way bring the purchases register into balance with the accounts payable ledger. This evidence is certainly insufficient to carry petitioners' burden of proving error in respondent's 38 adjustment; in fact, it tends to support respondent's determination. Consequently, we hold for respondent on this issue. It seems reasonable to assume that there is some relationship or overlap between the adjusting entries made in the purchases accounts of both Sons, Inc., and C & D, as respondent recognized to some extent in the notice of deficiency in decreasing C & D's income for the $15,862.16 of inventory it determined had been transferred *256 from Sons, Inc., to C & D without consideration. We are not certain just how our conclusions on the inventory items will affect the income tax liabilities of Sons, Inc., and C & D for the year 1967. Respondent appears to take alternative positions with respect to these items as well as the $34,173.59 adjusting entry made in the books of C & D. These matters can be worked out in the Rule 50 computation. The principal emphasis in the arguments on these items is in connection with transferee liability. In that regard, we believe the realities of the situation require the conclusion that Sons, Inc., transferred the inventory items directly to C & D without consideration and that those items should not be taken into consideration in determining the transferee liabilities of the individual stockholders of Sons, Inc. 39 Goodwill Issue Respondent determined that at the time it discontinued business in 1967 Sons, Inc., had goodwill having a value of $43,950.75 which was transferred to C & D without consideration, either directly or through the stockholders of Sons, Inc., to C & D. Respondent determined the value of the goodwill by the "income tax" method, which involves capitalizing earnings *257 in excess of a fair rate of return on the company's assets. Respondent used the income for the years 1962 through 1966 in his computation, eliminating the year 1967 because its loss was considered abnormal. Petitioners argue that Sons, Inc., had no goodwill because the success of its business in this highly competitive field depended on the individual reputation and efforts of its salesmen rather than on the reputation of Sons, Inc. This issue of goodwill is involved only in the transferee cases and is not directly involved in any of the income tax cases. Respondent contends that the transfer of this goodwill directly to C & D without consideration makes C & D liable, to the extent of the value thereof, for Sons, Inc.'s, tax liabilities, or, in the alternative, that the goodwill was transferred to the Sanders as stockholders of Sons, Inc., without consideration and by them contributed to C & D, which would make the Sanders liable, 40 to the extent of their proportionate interests in the value of the goodwill, for the income tax liabilities of Sons, Inc. We conclude from all the evidence that Sons, Inc., did have goodwill and that C & D was able to and did take advantage of that *258 goodwill without paying therefor. Again, we think the realities of the circumstances require the conclusion that this goodwill passed directly from Sons, Inc., to C & D, rather than through the stockholders, so if any transferee liability can be based thereon, C & D was the transferee. Without dwelling unduly on the facts upon which we base this conclusion, we note that Sons, Inc., established an impressive growth record from its inception in 1957 and did not experience a significant decline in its earnings until 1967; it had an excellent reputation in the commercial and retail carpet business which, in no small part, was the product of extensive advertising, trained and experienced personnel, customer referral, and good location. These aspects of the business operations generated a profit record considerably above that which ordinarily be expected from the capital investment committed to the business. George W. Staab, 20 T.C. 834 (1953); Erwin D. Friedlaender, 26 T.C. 1005 (1956). 41 Furthermore, though no goodwill was reflected in the company books, that, alone, is not controlling. R. E. Baker, 37 B.T.A. 1135 (1938). The evidence adduced at trial plainly establishes that C & *259 D did completely assume the going business of Sons, Inc. There appears to have been no complete cessation of business activity during the transitional period. C & D had essentially the same employees, officers, location, suppliers, stockholders, and customers and there can be no doubt that C & D was the recipient of substantially all of the assets of Sons, Inc., both tangible and intangible. There was not enough difference in the name of the two companies to cause any loss of goodwill. Metropolitan Bank v. St. Louis Dispatch Co., 149 U.S. 436 (1893); Ranier Brewing Co., 7 T.C. 162 (1946), affirmed per curiam 165 F. 2d 217 (C.A. 9, 1948). In the final analysis, there was no substantive change in the Sanders family carpet business, and whatever goodwill Sons, Inc., possessed became part and parcel of the going concern continued under the new name of Sanders Carpets and Draperies. With regard to the valuation of Sons, Inc.'s, goodwill, we approve the method and formula used by respondent, with certain exceptions hereinafter noted. There is no exclusive procedure for the valuation of goodwill. Each 42 case must be considered and determined in light of its own particular facts. Watab Paper Co., 27 B.T.A. 488 (1932). *260 The method chosen by respondent in this instance has enjoyed many years of use where the facts in a case have justified its use. Sanderson v. Commissioner, 42 F. 2d 160 (C.A. 2, 1930); Erwin D. Friedlaender, supra; Estate of Bluestein, 15 T.C. 770 (1950); Toledo Newspaper Co., 2 T.C. 794 (1943). See also 10 Mertens Law of Federal Income Taxation, sections 59.29 through 59.35. Moreover, respondent's formula is generally used where there is no better evidence available. [20]
However, we do take exception to one aspect of respondent's computation. Normally the formula used requires a minimum period of 5 years' earnings to compute average net annual earnings. Nevertheless, where a year evidences an abnormal decline or boom in earnings, it must be dropped from the computation. White & Wells Co. v. Commissioner, 50 F. 2d 120, reversing 19 B.T.A. 416; D.N. & E. Walter & Co., Inc., 10 B.T.A. 620 (1928). In such case there is no rigid number of years to be used as long as they are representative. C.F. Hovey Co., 4 B.T.A. 175 (1926). In 43 his computation respondent correctly dropped the year 1967 because in that year Sons, Inc., experienced a rather questionable *261 loss of extraordinary proportions. Respondent, therefore, used the 5 years 1962 through 1966. However, in the year 1962 Sons, Inc., appears to have realized an unusually large profit, so we will modify respondent's computation by dropping the year 1962 and using the 4 years 1963 through 1966 to determine the average net annual earnings. In doing so we find that Sons, Inc., had goodwill having a value of $16,921.50 in 1967. We think this is more representative of the true value of its goodwill at the time it went out of business, particularly if we give some weight to the testimony to the effect that Sons, Inc.'s, sources of credit dried up considerably after the opinion of this Court in the earlier case was published. [21] *262 44 Our conclusion is that for purposes of these cases, C & D received the goodwill of Sons, Inc., having a value of $16,921.50 without paying consideration therefor in 1967, and is liable as a transferee as a result thereof. Transferee Liability Respondent has asserted transferee liability against C & D and the Sanders for the 1965 deficiency determined against Sons, Inc., and for the uncollected assessment made against Sons, Inc., as a result of T.C. Memo 1967-146. It is well established that as a result of a corporate distribution, a distributee may be liable for personal income taxes thereon and also as a transferee for uncollected tax deficiencies assessed against the transferor corporation. Healy v. Commissioner, 345 U.S. 278 (1953). See also Estate of Samuel Stein, 37 T.C. 945 (1962); *263 Bennett E. Meyers, 21 T.C. 331 (1953). Section 6901 [22] provides a procedure whereby the respondent may collect unpaid taxes from a transferee. 45 The liability attaches through legal or equitable principles and is a matter of State law. Commissioner v. Stern, 357 U.S. 39 (1958). The burden of proof is on the respondent to establish that C & D and the individual petitioners are liable as transferees, but not to show that the taxpayer was liable for the tax. Section 6902(a). Respondent's primary position is that all of the assets of Sons, Inc., including the going business, were actually or constructively transferred *264 to the Sanders without consideration during the period September 1, 1967, through October 31, 1967. In the alternative, respondent alleges goodwill and certain inventory of Sons, Inc., were transferred directly to C & D without consideration. Respondent argues the transfers involved were predicated solely upon the petitioners' desire to delay, hinder, or defraud the collection of income tax deficiencies determined against Sons, Inc. Petitioners, however, are again contented to rest on their premise that the record fails to establish respondent's allegations. The applicable Colorado statutory law provides that conveyances, "made with the intent to hinder, delay or 46 defraud creditors * * * shall be void." Colo. Rev. Stat. Ann., Sec. 59-1-17. It further provides that the question of fradulent intent is one of fact, and lack of consideration, without more, does not render the ordinary transaction or transfer void against creditors as a matter of law. Colo.Rev. Stat. Ann., Sec. 59-1-20. Moreover, Colorado case law has embraced the equitable principle that any transfer by which a debtor dissipates his assets to become insolvent is fraudulent, thus invoking the "trust fund" doctrine *265 whereby the transferee becomes a trustee liable for the debtor's obligations to the extent of the assets he received. Steinbaugh v. Barday, 143 Colo. 133, 352 P. 2d 276 (1960). In prior Tax Court cases we have expressed our belief that the Colorado Courts, if Confronted with the issue, would apply the "trust fund" principle to corporate liquidations. See Commercial Finance Co., T.C. Memo 1968-229, which relies on Crowley v. Green, 148 Colo. 142, 365 P. 2d 230 (1961). We think our earlier supposition is still correct and would extend to even de facto liquidations. On the basis of the record as a whole and our conclusions with regard to the income tax deficiencies determined against the Sanders and C & D, we think respondent has convincingly carried his burden of proof to establish transferee liability. However, as with his income tax 47 deficiency determinations, we believe certain adjustments should be made with respect to the extent of the liability borne by each of the transferees. Since the evidence concerning the transferees' receipt of assets of Sons, Inc., has been discussed to determine their income tax liabilities, we will not duplicate that effort here. Suffice it to *266 say the individual transferees are deemed to have received the same amounts for purposes of transferee liability that they received as distributions in 1967; they tendered no consideration therefor but took the amounts to delay, hinder, or defraud respondent's efforts to collect the deficient taxes of Sons, Inc.; and Sons, Inc., was rendered insolvent thereby. Accordingly, we find that they are liable for the uncollected deficiencies determined against Sons, Inc., for the years 1962 through 1965 in the following amounts: Nathan M. Sanders
$47,403.27 [23]
Robert Sanders
27,013.94
Lawrence Sanders
22,972.93
Paul M. Sanders
32,254.38
It is also our conclusion, however, that none of the individual transferees received any goodwill or inventory 48 of Sons, Inc., either constructively or actually, during 1967. Moreover, though our decision concerning the 1967 distributions to the Sanders inherently provides that the series of distributions inevitably led to the insolvency of Sons, Inc., the same is not true of the withdrawals from the corporation *267 made by them in years prior to 1967. Cf. J. Warren Leach, 21 T.C. 70 (1953). Likewise, we find that C & D is liable, as a transferee, for the uncollected taxes of Sons, Inc., in the amount of $61,921.50. Our decision is based on the fact in 1967 C & D received from Sons, Inc., goodwill valued at $16,921.50 and inventory valued at $45,000.00, when it assumed and continued the Sanders family carpet business. C & D gave no consideration for these assets, but was a participant in the scheme contrived by the Sanders to defeat the tax liabilities of Sons, Inc., through a de facto liquidation. Cf. Given v. Commissioner, 238 F. 2d 579 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court. In accord with our findings herein, we sustain respondent's determination that the transferees are liable for the uncollected taxes of Sons, Inc., for the years 1962 through 1965, plus statutory interest thereon, to the extent of the amounts determined. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Paul L. Sanders, transferee, docket No. 2504-69; Lawrence Sanders, transferee, docket No. 2505-69; Nathan M. Sanders, transferee, docket No. 2506-69; Sanders Carpets & Draperies, Inc., transferee, docket No. 2507-69; Sanders and Sons, Inc., docket No. 2508-69; Sanders Carpets and Draperies, Inc., docket No. 6065-69; Paul L. Sanders and Sharon A. Sanders, docket No. 6066-69; Robert Sanders and Patricia Sanders, docket No. 6067-69; Lawrence Sanders and Roberta P. Sanders, docket No. 6068-69; and Nathan M. Sanders and Irene Sanders, docket No. 6069-69. ↩
2. We also incorporate, by this reference, the findings of Fact in Sanders and Sons, Inc., et al., T.C. Memo 1967-146↩. 3. Accrued on the books of Sanders and Sons, Inc., during March of 1963. 4. The stock ownership of C & D differed from that of Sons, Inc., in that Irene, Nathan's wife, owned no C & D stock, and Nathan's ownership in C & D was proportionately the same as that of his three sons. ↩
5. Colo. Rev. Stat. 1963, 31-24-90↩ (Vol. 10, 1967 Supplement). 6. Numerous small delinquent receivables with an aggregate amount of $3,447.47 were not purchased by C & D. ↩
7. Sons, Inc., retained carpet inventory consisting of mill ends with a book value of $29,648.83. ↩
8. All three of the checks issued to petitioners were endorsed and deposited into Lawrence Sanders' personal bank account. ↩
9. There is no clear evidence in the record to indicate that these bonuses were at any time sanctioned by the board of directors of Sons, Inc. ↩
10. Aside from the $10,000 "bonus" checks and the checks issued to Robert, Lawrence, and Paul when the corporation closed out its loans payable accounts to them, there were no additional actual distributions made by Sons, Inc., to the Sanders. ↩
11. C & D paid Sons, Inc., for the inventory with four separate checks: One for $5,000 issued on October 16, 1967; $23,000 issued on October 19, 1967; $17,000 issued on October 31, 1967; and $21,950 issued on October 31, 1967. There was an additional $37,288.69 in inventory transferred to C & D along with the attendant accounts payable in that amount. ↩
12. Petitioners Robert Sanders and Lawrence Sanders, and their wives, were before the Court to determine only their tax liabilities for the year 1964. ↩
13. The assets of Sons, Inc., consisted of inventory with a book value of $29,648.83 and delinquent accounts receivable in the aggregate amount of $3,447.47. ↩
14. The liabilities of Sons, Inc., consisted of county property taxes of $3,053.42, the Federal corporate income tax deficiency, including interest, of $90,996.55, and attorney's fees of $1,000. ↩
15. There were several additional minor adjustments determined by respondent with respect to petitioners' 1966 returns, but these are no longer in issue. 16. here were several additional minor adjustments determined by respondent with respect to petitioners' 1966 returns, but these are no longer in issue. ↩
17. We do not know just how respondent arrived at these figures. ↩
18. This Court having decided in Sanders and Sons, Inc., et al., supra, that the alleged bonus payments made to the Sanders by the corporation for the years 1962 through 1964, under the same circumstances as they were paid for the years 1965 through 1967, were a sham and were not in fact paid, we are constrained to reach the same conclusion with respect to bonuses paid in the years here involved, except for the bonuses paid in September 1967. However, inasmuch as Sons, Inc., was a Subchapter S corporation for the years 1966 and 1967, we cannot foretell with any certainty the effect of our conclusions herein on the taxable income of the individual petitioners herein. Consequently, in this opinion, we will simply decide the issues presented and the tax effect therof will have to be computed by the parties under Rule 50↩. 19. It is undisputed that in addition to the inventory Sons, Inc., transferred to C & D for cash, Sons, Inc., also transferred inventory having a cost of $37,288.69 to C & D along with the attendant accounts payable in that amount. Apparently this must have been transferred before the physical inventory was taken; at least neither party mentions it in the accounting on this issue. ↩
20. Ushco Mfg. Co., T.C. Memo 1945-445↩. 21. While it is not specifically raised as an issue in this case, and neither party argues the point on brief, we have some doubts that the isolated transfer of an intangible asset such as goodwill, which does not appear as an asset on the books of the transferor, can give rise to transferee liability. The transfer of an intangible asset which does not appear on the books of the transferor can hardly be said to render the transferor insolvent. If the transferor was already insolvent at the time of the transfer, it is doubtful that intangible goodwill as such could be used in any way for the benefit of its creditors. It also seems unlikely that goodwill could be transferred, within the meaning of the statute, independent of a transfer of the entire business. We have found no cases in point and, inasmuch as this was not raised as an issue in this case, we find it unnecessary to decide it here. 22. Section 6901(1) provides, in pertinent part: (a) Method of Collection. - The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) Income, Estate, and Gift Taxes. - (A) Transferees. - The liability, at law or in equity, of a transferee of property - (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), * * * ↩
23. This figure includes both Nathan's income from the excessive compensation distributions and the forgiven debts of Crest Interiors and Eagle Properties. ↩